UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Susan E. Bica


          v.                         Civil No. 11-cv-86-JD
                                     Opinion No. 2011 DNH 193


Michael J. Astrue, Commissioner
Social Security Administration


                         O R D E R


     Susan E. Bica seeks judicial review, pursuant to 42 U.S.C.
§ 405(g), of the decision of the Commissioner of the Social
Security Administration, denying her application for social
security disability insurance benefits under Title II.  Bica
challenges the decision on the grounds that the Administrative
Law Judge ("ALJ") failed to provide a fair new hearing after her
case was remanded, failed to provide intelligence testing for
her, failed to consider her cognitive impairments at Step Two,
failed to assess limitations due to her severe impairments, and
did not assess properly the medical opinions.[1]  Bica asks the
court to reverse the decision without a rehearing.  The
Commissioner moves to affirm the decision.

_____

     [1]The ALJ uses a five-step sequential analysis to decide a
claimant's eligibility for disability insurance benefits.  See 20
C.F.R. § 404.1520.

Background[2]

Bica applied for social security disability insurance benefits on September 19, 2006, alleging a disability as of June 29, 2003.  Her last insured date was June 30, 2003.  She claimed a disability due to a ruptured disc, anxiety, depression, and headaches.  Because Bica's back injury, which caused the ruptured disc, occurred in 2004, limitations due to that injury are not relevant to her residual functional capacity as of her date last insured.

A.   Medical Records

Medical records beginning in 1994 document that Bica was occasionally treated for headaches.  In May of 1997, Bica sought treatment at the Women's Counseling Center for anxiety.  She was twelve weeks pregnant at that time.  She had therapy sessions approximately every two weeks until her baby was born.  She also took medication for anxiety and depression.  After the birth of the baby, Bica sought treatment every few months and continued medication for depression.  In December of 1998, Donna Mohan, ARNP, noted that Bica was very tearful, and Mohan expressed

---

[2]The background information is taken from the parties' joint statement of material facts, which are summarized only to the extent necessary for this decision.  See LR 9.1.(b)(2).

concern about Bica's safety and the safety of her baby.  Bica continued to see Mohan and also was treated by Dr. Davidson, a psychiatrist.

In September of 1999, Bica saw Mohan about migraine headaches and depression.  Mohan recommended therapy for Bica's depression.  Mohan's notes indicate periods of improvement and also periods of increased symptoms.

Beginning in April of 2000, Bica saw Dr. Fitzpatrick, initially for abdominal pain.  In September of 2000, Dr. Fitzpatrick diagnosed depression and anxiety disorder and changed Bica's medications.  Bica was also being treated by a psychologist, Dr. Susan Vonderheide, and agreed to allow Dr. Fitzpatrick to speak to Dr. Vonderheide.  Because of her headaches, Bica had a CT scan in January of 2001, with unremarkable results.  In March of 2001, Dr. Fitzpatrick noted that Bica had migraine headaches and poor coping skills.

In May of 2001, Bica had an initial psychiatric evaluation done by Dr. Priscilla Cusi.  Dr. Cusi diagnosed Bica with bipolar disorder and prescribed medication.  Bica saw Dr. Cusi again in June and reported that her anxiety was alright but she felt "spacey."

Beginning in November of 2002, Bica saw Dr. Deborah Ganem, who practiced with Dr. Fitzpatrick.  Dr. Ganem noted Bica's

history of chronic anxiety, migraine headaches, irritable bowel
syndrome, and depression and thought that the headaches at that
time were due to medications.  Bica saw Dr. Ganem every few weeks
for a variety of complaints.  In March of 2003, Dr. Ganem saw
Bica for anxiety and headaches.  Bica reported that she felt
close to having a nervous breakdown.  Dr. Ganem recorded that
Bica's headaches were likely due to taking too much medication
and assessed anxiety, somatization disorder, depersonalization,
and functional dyspepsia.  Dr. Ganem further noted that Bica's
problems with concentration contributed to her anxiety.

       In March of 2003, Dr. Cusi reported that Bica was anxious,
had poor concentration, had tense posture, was irritable, had
limited insight, and had paranoid perceptions.  The next month,
Dr. Cusi noted that Bica was anxious and agitated with poor
concentration and unkempt appearance.  In May, Dr. Cusi noted
improvement.  At an appointment on June 23, 2003, however, Dr.
Cusi wrote that Bica had fluctuating mood, racing thoughts,
paranoia, poor concentration, sleep problems, and decreased
appetite and energy but that she also had an appropriate
appearance, relevant thoughts, and was fully oriented.  In July
of 2003, Dr. Cusi assessed moderate anxiety and diagnosed mood
disorder.  On July 8, 2003, Dr. Cusi noted that Bica's affect was
irritable, her posture was normal, she was cooperative and

coherent, and she was fully oriented.  Dr. Cusi prescribed a new medication, Lexapro.

Dr. Eugene Lesser did a neurological evaluation on July 23, 2003.  The results were normal.  Dr. Lesser's impression was that Bica had a history that was consistent with migraine headaches without aura.

Bica continued treatment for gastro-intestinal and mental health issues.  She was diagnosed with chronic reflux disease.  Dr. Cusi noted fluctuating mood and concentration.  Bica also continued to have headaches.

On August 19, 2004, Bica injured her back at work.  She started physical therapy the next day but made very slow progress.  An MRI done in November of 2004 showed disc protrusion at L5-S1.  By June of 2005, Bica was working part time in a light duty job.

Beginning in February of 2006, Bica was evaluated by Sharon Lockwood, PA-C, a registered nurse and physician's assistant with Foundation Neurology, to determine whether her medications were causing migraine headaches.  Bica's medications were adjusted over the next month to control her headaches.  Bica continued to be treated for headaches and other symptoms through that year. In December of 2006, she was diagnosed with Sjogren's syndrome,

which is "marked by a triad of keratoconjunctivitis sicca" along with possible gland enlargement and connective tissue disease.[3]

Dr. Nadine Dubrule ordered an MRI scan of Bica's brain done in June of 2007, which showed no acute pathology and otherwise unremarkable results.  In July of 2007, Bica was evaluated at Monadnock Behavioral Health by Dr. Theresa Cadorette, a physiatrist.  Dr. Cadorette noted that Bica had an unspecified mood disorder and indicated that bipolar disorder, major depressive disorder, and anxiety disorder needed to be ruled out. After receiving Bica's treatment notes from other providers, Dr. Cadorette noted that Bica's complaints remained unchanged and diagnosed possible atypical bipolar disorder. Dr. Cadorette indicated that for diagnosis, hypochondria versus somatization disorder would have to be ruled out.  Dr. Cadorette recommended that Bica increase her activities and volunteer outside the home.

On July 23, 2007, an electroencephalogram test of Bica's brain ordered by Ms. Lockwood showed abnormal results in the right paracentral region.  Ms. Lockwood referred the results to Dr. Tatiana Nabioullina who concluded that Bica had headaches due to anxiety and "analgesic rebound" and that the abnormalities on

---

[3]The definition of Sjogren's syndrome provided in the statement of facts does not define keratoconjunctivitis sicca, which apparently means dry eye syndrome due to a lack of tears to coat the eye.

the EEG test "possibly related to the history of migraines."  Dr.
Nabioullina's history of Bica's headaches indicated that she was
experiencing mild headaches daily and bad headaches about twice
each month.

Medical records document that Bica continued treatment for
headaches, anxiety and depression, Sjogren's syndrome, and other
complaints through July of 2010.  In June of 2010, Dr.
Vonderheide recommended that Bica be tested for low IQ.  No IQ
testing was done.


B.  Functional Capacity Assessments

In November of 2007, Dr. Nadine Dubrule, a treating source,
completed physical and mental capacity evaluation forms.  For
physical capacity, Dr. Dubrule indicated Bica could sit for seven
hours in a work day, could stand and walk for up to one hour in a
work day, could frequently lift up to five pounds, and could
occasionally lift up to ten pounds.  She ruled out bending,
squatting, crawling, and climbing and indicated moderate
restrictions for activities involving unprotected heights,
machinery, and driving.  Dr. Dubrule also concluded that Bica was
completely disabled from competitive employment.

For purposes of mental evaluation, Dr. Dubrule concluded
that Bica was markedly limited in her ability to maintain

7

attention and concentration for extended periods.  She found
moderate limitations in Bica's ability to understand, remember,
and carry out detailed instructions but no significant
limitations in her ability to understand, remember, and carry out
very short and simple instructions.  Dr. Dubrule also found
moderate limitations in Bica's abilities for other work-related
activities but found no limitation in her ability to interact
with the general public, to ask simple questions and request
assistance, to get along with coworkers, and to maintain socially
appropriate behavior.

Dr. Cadorette also completed a mental residual functional
capacity assessment form in November of 2007.  Dr. Cadorette
found that Bica was markedly limited in her ability to remember
locations and work procedures; to understand, remember, and carry
out both simple and detailed instructions; to perform activities
within a schedule, including maintaining regular attendance and
punctuality; and to respond appropriately to changes in the work
setting.  Dr. Cadorette also found moderate limitations in Bica's
ability to maintain attention and concentration for extended
periods, to work with others, to make work-related decisions, and
other work activities.

In December of 2007, Dr. Vonderheide completed a mental
residual functional capacity assessment form.  Dr. Vonderheide

found that Bica had marked limitations in her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods, to sustain an ordinary routine without supervision; to work with or near other workers; to make simple work-related decisions; to complete a normal work day and work week; to interact appropriately with the public; and to set realistic goals and make plans.  She also found that Bica had limited ability to follow through with work-related activities because of depression, chronic pain, and multiple medications.

On June 18, 2008, Ms. Lockwood completed a residual functional capacity assessment based on an evaluation of Bica's headaches.  She stated that Bica had a poor prognosis and that she would need unscheduled breaks during a work day.  In her opinion, Bica was not capable of even low stress work and would likely be absent for more than four days each month.  Ms. Lockwood's opinion was approved by Dr. Nabioullina.

A certified independent medical examiner, Dr. Barbara O'Dea, completed a physical capacities evaluation form for Bica on July 15, 2008.  Dr. O'Dea found that Bica could sit for up to six hours in an eight hour day, could stand and walk for one hour each per day, could lift up to five pounds frequently and ten pounds occasionally, and could not squat, crawl, climb, or reach.

In her opinion, Bica would miss at least three days of work each month, and Bica's medical and psychiatric issues would make full-time work very difficult.

Dr. Vonderheide also completed a physical residual functional capacity assessment in which she stated that Bica was more prone to physical pain because of her depression and repeated Bica's reports of pain.  She thought Bica would be likely to miss more than three days of work each month.  Dr. Vonderheide did not assess specific physical limitations because her area of expertise was mental health.  Dr. Vonderheide did give her opinion that Bica was unable to work full time.

### C. Procedural History

Bica's application for social security benefits, filed on September 19, 2006, was denied initially by a reviewing officer, and she requested a hearing before an ALJ.  The hearing was held on July 31, 2008.  Bica appeared with counsel and testified at the hearing.  The ALJ issued a decision on August 18, 2008, finding that Bica was not disabled, and the decision was affirmed by the Decision Review Board.

Bica filed an action in this court, seeking review on five grounds.  Judge McAuliffe remanded the case for a new administrative determination because the ALJ had not decided

whether Bica was disabled at the time of the hearing, a necessary predicate to deciding whether she was disabled before her last insured date.  Bica v. Astrue, 2009 WL 3756894, at *4 (D.N.H. Nov. 9, 2009).  On remand, the Appeals Council vacated the ALJ's decision and sent the case to an ALJ for proceedings consistent with the court's order.  The case was assigned to a new ALJ.

    D.   <u>Hearing</u>

The ALJ held a hearing on June 18, 2010.  Bica came to the hearing with her counsel, but she could not enter the hearing room because of anxiety.  Counsel explained that Bica had recently reported having a "nervous breakdown" to her treating psychologist, Dr. Vonderheide.  Later in the hearing when two consulting experts appeared by telephone, the ALJ discovered that they did not have all of the medical records from Bica's file. The hearing was continued to September 8, 2010.

When the hearing resumed, Dr. Vonderheide appeared in person and testified.  Thomas Bica, Susan Bica's husband, and Donna Bica, her mother-in-law, testified about Bica's activities and limitations.  Bica waited outside the hearing room during their testimony but then entered and testified.  Two consulting medical experts, Dr. Winkler and Dr. Hoffnung, testified by telephone.  A vocational expert also testified.

11

Dr. Vonderheide testified that she began treating Susan Bica in January of 2003 and had continued treatment to the time of the hearing. She said that in 2003 Bica demonstrated a generalized mood disorder and major depression, with a highly anxious and mildly agitated demeanor. At that time, Bica was experiencing marital difficulties and was having trouble raising her only child. Dr. Vonderheide stated that by 2007 she realized that Bica was unable to follow through on the recommendations she had made during the early years of the treatment relationship. She also testified that her observations and opinions provided in the 2007 functional capacity assessment were applicable in 2003, explained that she did not have her treatment notes from 2003, and provided a summary of her treatment for the period before she had treatment notes. Dr. Vonderheide thought that Bica had a low IQ, although no testing had been done, and noted that Bica had not completed high school. Dr. Vonderheide recommended that intelligence testing be done to assess Bica's disability.

Dr. Winkler testified about Bica's physical limitations. He stated that at the time of the hearing, Bica was limited to light work with a sit/stand option and limited postural activities and that as of her last insured date in 2003, she did not have physical limitations. Dr. Winkler did not give an opinion on the

12

effect of Bica's headaches, leaving that as a matter of
credibility for the ALJ to decide.

Dr. Hoffnung testified about Bica's mental health
limitations, noting that the records showed treatment for
depression and anxiety beginning in 1997 and that Bica's symptoms
had been disabling at times when she was under stress.  Dr.
Hoffnung stated that Bica had an affective disorder and an
anxiety-related disorder, with a variety of symptoms including
recurrent obsessions.  She testified that at times Bica's
activities of daily living showed only a mild impairment but at
other times Bica was moderately impaired.  She further testified
that Bica's limitations in the areas of being sensitive to
criticism and her ability to maintain consistence, concentration,
and pace were marked.  She said that based on Bica's records it
was unclear when her mental impairments began to affect Bica's
functional capacity but that she had no reason to disagree with
Dr. Vonderheide's opinions given during her hearing testimony.

The vocational expert testified that a person who was able
to do medium, semi-skilled work would be able to work in Bica's
former jobs as a hotel housekeeper, data entry clerk, and packer.
If the person were limited to light work with a sit/stand option,
postural limitations, and no more demanding than semi-skilled
work, the person would not be able to do Bica's former jobs but

13

could do other work.  In the third hypothetical, the ALJ
described a person whose concentration, pace, and persistence and
ability to interact with others were markedly impaired.  The ALJ
testified that those limitations precluded all other work.

    E.  <u>Decision</u>

In the decision issued on October 25, 2010, the ALJ found
that through her last insured date of June 30, 2003, Bica had
severe impairments of a mood disorder, an anxiety disorder, and
migraines.  Through the date of the hearing, Bica also had a
severe impairment due to a disc herniation.  The ALJ concluded
that through the date of the hearing, Bica did not have an
impairment or a combination of impairments that met or equaled a
listed impairment.  The ALJ further found that until she injured
her back in 2004, she had a residual functional capacity to do
medium work but was limited to work at the semi-skilled level or
less.  From 2004 through the date of the hearing, the ALJ found
that Bica could do light work with a sit/stand option, postural
limitations, and no more than semi-skilled work.

Based on those residual functional capacity assessments and
the vocational expert's testimony, the ALJ found that jobs
existed that Bica could do.  As a result, the ALJ found that Bica
was not disabled before her last insured date of June 30, 2003,

and had not been disabled at any time from June 29, 2003, through the date of the decision.

The Decision Review Board selected Bica's case for review but then was unable to complete review within the time allowed. Therefore, the ALJ's decision became the Commissioner's decision. Bica filed for judicial review of the decision.

## Standard of Review

In reviewing the final decision of the Commissioner in a social security case, the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The court defers to the ALJ's factual findings as long as they are supported by substantial evidence.  § 405(g).  "Substantial evidence is more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Astralis Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010).

Disability, for purposes of social security benefits, is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

15

expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a). The ALJ follows a five-step sequential analysis for determining whether a claimant is disabled. § 404.1520. The claimant bears the burden, through the first four steps, of proving that her impairments preclude her from working. <u>Freeman v. Barnhart</u>, 274 F.3d 606, 608 (1st Cir. 2001). At the fifth step, the Commissioner determines whether work that the claimant can do, despite her impairments, exists in significant numbers in the national economy and must produce substantial evidence to support that finding. <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001).

<u>Discussion</u>

Bica contends that the Commissioner's decision must be reversed because the ALJ failed to provide a full and fair hearing, to develop the record with respect to her cognitive impairments, to evaluate her cognitive impairments at Step Two, to find limitations caused by her non-exertional impairments at Step Four, and to properly assess the opinions of her treating sources. Bica asks that the decision be reversed, without rehearing, based on the vocational expert's testimony at the 2010 hearing. The Commissioner moves to affirm, asserting that the

16

ALJ provided an appropriate review and a decision supported by substantial evidence.

    A.  <u>Full and Fair Hearing</u>

For purposes of a social security application, the ALJ must consider all the evidence in the record. <u>Jones v. Astrue</u>, 619 F.3d 963, 979 (8th Cir. 2010). The ALJ is not required to discuss all the record evidence as long as the decision shows that the ALJ considered the record evidence pertaining to the claimant's disability. <u>Jones v. Astrue</u>, 623 F.3d 1155, 1162 (7th Cir. 2010); <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005). On the other hand, however, an ALJ may not ignore relevant evidence, particularly relevant evidence that supports the claimant's application. <u>Terry v. Astrue</u>, 580 F.3d 471, 477 (7th Cir. 2009); <u>Dube v. Astrue</u>, 781 F. Supp. 2d 27, 35 (D.N.H. 2011); <u>Lord v. Apfel</u>, 114 F. Supp. 2d 3, 13 (D.N.H. 2000).

In this case, Bica submitted a significant amount of new medical evidence to support her claim on remand. She contends that the ALJ did not consider the new evidence and instead merely adopted the findings made by the previous ALJ in the first decision. As the Commissioner points out, the ALJ did consider at least some of the new evidence. The more significant issue

17

appears to be the ALJ's understanding of the purpose of the
remand and his analysis of the evidence.

The ALJ stated at the beginning of his decision that the
district court had remanded the case only to determine whether
Bica had become disabled after her last insured date and had not
ordered reconsideration of the finding that Bica was not disabled
before her last insured date.  The ALJ's statement indicates a
misunderstanding of the remand order.  In the prior order, the
court explained that because the record indicated that Bica's
impairments could be progressive, the ALJ must "determine, in the
first instance, whether Bica is currently under a disability and
then, if necessary, determine an onset date with the assistance
of a medical expert."  Bica, 2009 WL 3756894, at *4.

In other words, if Bica were disabled by the time of the
hearing,  the ALJ then would be required to determine when she
became disabled for purposes of deciding whether she was disabled
before her last insured date.  In addition, because there was a
new hearing on remand and additional evidence, the record changed
for purposes of assessing Bica's residual functional capacity.
Given the district court's order and the augmentation of the
administrative record on remand, a new analysis of Bica's
residual functional capacity was necessary.  Whether the ALJ's
misunderstanding of the district court's decision and the

18

procedural posture of the case affected the outcome is addressed in the context of the ALJ's residual functional capacity assessment at Step Four.

     B.  <u>Development of the Record</u>

Bica contends that the ALJ should have, but did not, supplement the record by ordering intelligence testing.  She points to Dr. Vonderheide's testimony at the hearing that Bica should be tested to determine her intelligence level and to comments by other providers as early as 1997 that questioned her intelligence level.  The Commissioner contends that the ALJ had no obligation to order intelligence testing.

It is the claimant's responsibility to "provide medical evidence showing that [she has] an impairment(s) and how severe it is during the time [she] say[s] that [she was] disabled." § 404.1512(c).  "The [Social Security] Act provides that '[a]n individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require.'"  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987) (quoting 42 U.S.C. § 423(d)(5)(A)).  Because a social security hearing is non-adversarial, an ALJ has a responsibility to develop the record if necessary.  <u>See</u> <u>Sims v. Apfel</u>, 530 U.S. 103, 110-11 (2000);

<u>Jones</u>, 619 F.3d at 979; <u>Henrie v. Dep't of Health & Human Servs.</u>, 12 F.3d 359, 360-61 (10th Cir. 1993); <u>Currier v. Sec'y of Health, Educ. & Welfare</u>, 612 F.2d 594, 598 (1st Cir. 1980); <u>see also</u> §§ 404.1512(d)-(f) & 404.1519a(b).

When a claimant is represented by counsel, ordinarily an ALJ may rely on counsel to present the claimant's case and to develop her claims.  <u>Faria v. Comm'r of Social Sec.</u>, 1998 WL 1085810, at *1 (1st Cir. Oct. 2, 1998) (citing <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1167 (10th Cir. 1997)).  The Commissioner's decision will not be reversed based on an ALJ's failure to adequately develop the record absent a showing that the claimant was prejudiced by a gap in the evidence.  <u>Ellis v. Barnhart</u>, 392 F.3d 988, 994 (8th Cir. 2005); <u>Carey v. Apfel</u>, 230 F.3d 131, 142 (2d Cir. 2000); <u>Brock v. Chater</u>, 84 F.3d 726, 728 (5th Cir. 1996); <u>Brown v. Shalala</u>, 44 F.3d 931, 935 (11th Cir. 1995).  To establish prejudice, the claimant must show that the missing evidence might have led to a decision in her favor.  <u>Alker v. Astrue</u>, 2011 WL 1770473, at *4 (D.N.H. May 10, 2011).

Bica has been represented by counsel through the history of this case.  Based on Bica's analysis of the record, the issue of whether she was impaired by low intelligence arose in 1997 and was mentioned several times thereafter by her treating providers. Nevertheless, Bica did not provide testing evidence to support a

claim of disability or explain why she did not do so.  Under
these circumstances, it was Bica's responsibility to provide
evidence to show that she was disabled, not the ALJ's
responsibility to supplement the record to support a claim that
Bica did not clearly raise.

In addition, Bica has not shown prejudice due to the lack of
testing evidence.  Bica contends that if the ALJ had ordered
intelligence testing, the results probably would have shown that
she met the requirements for the listing at 20 C.F.R. Pt. 404,
Subpt. P, App. 1, § 12.05(C).  Listing 12.05(C) requires:

> Mental retardation:  Mental retardation refers to
> significantly subaverage general intellectual
> functioning with deficits in adaptive functioning
> initially manifested during the developmental period:
> i.e., the evidence demonstrates or supports onset of
> the impairment before age 22.
>                  . . .
> C.  A valid verbal, performance, or full scale IQ of 60
> through 70 and a physical or other mental impairment
> imposing an additional and significant work-related
> limitation of function; . . . .

The record includes no evidence of deficits in adaptive
functioning before Bica was twenty-two.  To the extent Bica may
argue that her failure to finish high school provides such
evidence, her high school record has not been cited and does not
appear to be part of the administrative record in this case.  She
has not shown that the lack of a high school diploma, along with
testing scores within the prescribed range, would meet the

listing.  Therefore, the lack of intelligence testing ordered by
the ALJ is not a basis for reversing the decision.

      C.  <u>Cognitive Impairment at Step Two</u>

At Step Two of the sequential analysis, an applicant for
social security benefits must show "that [s]he has a medically
severe impairment or combination of impairments."  <u>Bowen v.
Yuckert</u>, 482 U.S. 137, 146 n.5 (1987).  The requirement of a
medically severe impairment or combination of impairments is met
unless the record shows "only a slight abnormality or combination
of slight abnormalities which would have no more than a minimal
effect on an individual's ability to work even if the
individual's age, education, or work experience were specifically
considered."  <u>McDonald v. Sec'y of Health & Human Servs.</u>, 795
F.2d 1118, 1124 (1st Cir. 1986).  The purpose of Step Two is "to
do no more than screen out groundless claims."  <u>Id.</u>

Bica contends that the ALJ erred in failing to find, at Step
Two, that she had a severe cognitive impairment.  Based on the
joint factual statement, however, Bica did not claim a disability
due to cognitive impairment.

In addition, as Bica acknowledges, the record includes no
evidence of intelligence testing to support a cognitive
impairment.  The only evidence Bica cites to support a cognitive

impairment is her failure to graduate from high school, her bad memory and "trouble with thinking," and indications by several medical providers that they questioned whether she had low intelligence.  Under the circumstances presented, the record was insufficient to support consideration of a cognitive impairment at Step Two.

Further, the ALJ did find other severe impairments at Step Two and continued on through the sequential analysis.  Therefore, the omission of low intelligence as a severe impairment does not require reversal of the decision at Step Two.  See, e.g., Delia v. Comm'r of Social Security, 2011 WL 2748622, at *1 (11th Cir. July 14, 2011); Carpenter v. Astrue, 537 F.3d 1264, 1266 (10th Cir. 2008); Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005).

D.  Residual Functional Capacity Assessment and Medical Opinions

At Step Four of the sequential analysis, "the ALJ will assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence in [the] case record."  § 404.1520(e).  The residual functional capacity assessment is then used at Steps Four and Five to determine whether there is work the applicant can do. Id.  A claimant's residual functional capacity "is the most [she]

23

can still do despite [her] limitations." § 404.1545(a)(1).  In
making that assessment, the ALJ "will consider all of [the
claimant's] medically determinable impairments of which [the ALJ
is] aware, including [the claimant's] medically determinable
impairments that are not 'severe,' as explained in [sections]
404.1520(d), 404.1521, and 404.1523 . . . ." § 404.1545(a)(2).

Relevant medical evidence the ALJ considers in making a
residual functional capacity assessment includes "the medical
opinions in [the claimant's] case record together with the rest
of the relevant evidence [in the record]." § 404.1527(b).  The
ALJ attributes weight to a medical opinion based on the nature of
the relationship between the medical provider and the claimant.
§ 404.1527(d).

An opinion based on one or more examinations is entitled to
more weight than a non-examining source's opinion, and a treating
source's opinion, which is properly supported, is entitled to
more weight than other opinions.  Id.  A treating source's
opinion on the nature and severity of the claimant's impairments
will be given controlling weight if the opinion is "well-
supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other
substantial evidence in [the] case record." § 404.1527(d)(2).
"If any of the evidence in [the claimant's] case record,

24

including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, [the ALJ] will weigh all of the evidence and see whether [she] can decide whether you are disabled based on the evidence we have."  § 404.1527(c)(2).

In this case, the ALJ began with an error, stating in his decision that Bica claimed "disabling problems with headaches and depression."[4]  Admin. Rec. at 441.  Bica claimed disability based on headaches, depression, and anxiety.  The ALJ found at Step Two that Bica had severe impairments of a mood disorder, an anxiety disorder, and headaches.  In his analysis, however, the ALJ focused on headaches and depression or mood disorder but did not mention anxiety.  The ALJ did not explain why he did not consider anxiety as an impairment in his analysis of the case.

The ALJ considered the record evidence pertaining to disability before June 30, 2003, through 2004, followed in a separate section of analysis of the evidence from 2004 through the hearing date.  On remand, however, the district court directed the Social Security Administration to <u>first</u> determine whether Bica was disabled as of the hearing date, and if so, to determine when the disability began.  Although not specifically

---

[4]In addition, at Step Two the ALJ found that Bica had severe impairments due to a mood disorder, an anxiety disorder, and headaches.

25

addressed in the order, by implication, if Bica were determined
not to be disabled as of the hearing date, the ALJ would then
assess her residual functional capacity and whether she was
disabled as of her last insured date.  By analyzing the issues in
the wrong order, the ALJ did not comply with the remand order.

The ALJ also proceeded under the mistaken assumption that
the original residual functional capacity assessment for the
period through Bica's last insured date was undisturbed on
remand.  The ALJ found that the evidence of Bica's impairments
did not support the intensity, persistence, or limiting effects
Bica described.  The ALJ concluded that until she injured her
back in 2004, Bica was able to do medium work but was restricted
to no more than semi-skilled jobs.  For the period from 2004
until the time of the hearing in September of 2010, the ALJ found
that Bica had a residual functional capacity to do light work
with certain postural limitations and a restriction to no more
than semi-skilled jobs.  The Commissioner argues that the ALJ
adequately accounted for any mental impairments by restricting
Bica's residual functional capacity assessments to no more than
semi-skilled work.

1.   Residual Functional Capacity at the Time of the Hearing

For purposes of determining Bica's residual functional
capacity at the time of the hearing, the ALJ considered the

opinions of the two medical experts who testified at the hearing, the opinions of Bica's treating sources, including Dr. Vonderheide who testified at the hearing, and the record pertaining to Bica's headaches.  Based on Dr. Winkler's opinion, the ALJ found that Bica's back injury in 2004 restricted her to light work with a sit/stand option and certain postural limitations.  The ALJ gave "great weight" to Dr. Winkler's opinions, gave "moderate weight" to Dr. Hoffnung's opinions, and "little weight" to the opinions of Bica's treating sources, including Dr. Vonderheide.

Dr. Winkler's opinion does not provide the information that the ALJ attributes to it.  Dr. Winkler primarily assessed Bica's physical limitations and whether those limitations met the requirements of a listed impairment.  He did not consider Bica's depression or anxiety.  With respect to her headaches, Dr. Winkler thought that some of the headaches may have been caused by medications prescribed for depression and pain and also stated that migraine headaches were subjective, so that the ALJ would have to evaluate the effect on Bica's ability to work.  When Bica's counsel asked Dr. Winkler whether the record indicated that Bica would have a problem with attending work on a regular basis, he answered that the record was "sometimes conflicting" and noted several physician's reports that Bica was released to do light work and Bica's efforts to do part-time work.  He

27

concluded that Bica would have to testify about how bad her
headaches were.[5]  Therefore, contrary to the ALJ's
interpretation, Dr. Winkler did not give an opinion that Bica
could sustain gainful work activity through the entire period in
question.

    The ALJ gave Dr. Hoffnung's opinion only moderate weight
because "her opinion is somewhat equivocal at times."  Admin.
Rec. at 444.  Despite the ascribed weight, the ALJ did not state
the substance of Dr. Hoffnung's opinions or appear to give any
weight to her opinions.

    Dr. Hoffnung reviewed the record evidence in detail, noting
that from the beginning of treatment Bica had difficulty with
depression and anxiety and a long history of disabling symptoms
associated with stress.  Dr. Hoffnung found that Bica had marked
limitations due to anxiety in her social functioning abilities
and in her ability to maintain persistence, concentration, and
pace.  When asked when her disabling condition began and whether
Bica had been disabled for a twelve-month period, Dr. Hoffnung
said that it was very difficult to tell.  She also testified that
based on Dr. Vonderheide's record, provided in her treatment

---

    [5]Bica was asked about the severity of her headaches in
response to Dr. Winkler's testimony.  Bica testified that she had
migraine headaches two or three times each month and that each
episode lasted two or three days.

summary, her own opinion was that Bica's mental impairments were likely to have met a listed impairment by January of 2003. In response to Bica's counsel's questions, Dr. Hoffnung said that she did not know if the physical manifestations of Bica's anxiety and depression would have prevented her from working.

The ALJ discounted the opinions of Bica's treating sources, as a group, because "these providers indicated that the claimant could not perform substantial gainful activity due to the combination of her back pain and headaches." Admin. Rec. at 444. In contrast, the ALJ interpreted the record to show that Bica's office visits showed normal gait, an ability to sit with a sit/stand option, a normal neurological examination, and waxing and waning headache severity with no sustained period of severe headaches. The ALJ did not address specifically other opinion evidence.

Dr. Nabioullina wrote a history of Bica's headaches as of September 4, 2007, stating that Bica had daily mild headaches and that she had bad headaches and "zoning out" twice per month. Ms. Lockwood prepared a residual functional capacity assessment for headaches in June of 2008, which was approved by Dr. Nabioullina. Ms. Lockwood concluded that Bica was incapable of even low stress jobs and would be absent more than four days each month.

The ALJ also did not mention the evaluation done by a certified independent medical examiner, Dr. O'Dea, on July 15, 2008.  Dr. O'Dea stated that Bica could be expected to miss at least three days of work each month due to a combination of migraines and back pain and that her combination of limitations would make it difficult to obtain gainful employment.

Dr. Vonderheide provided a residual functional capacity assessment in December of 2007, which found marked limitations in Bica's ability to do many work-related activities, including her ability to complete a normal work day and work week.  Dr. Vonderheide's opinion is consistent with the opinions of Dr. Dubrule and Dr. Cadorette, provided in November of 2007, which document, among other limitations, moderate to marked limitations in Bica's abilities to maintain attention and concentration for extended periods and to maintain regular attendance.  At the hearing, Dr. Vonderheide testified about her long treatment history with Bica and focused on Bica's limitations before her last insured date.[6]

In summary, the record provides strong evidence that Bica had at least moderate impairments due to anxiety, depression, and headaches beyond a need for only semi-skilled jobs.  The ALJ's

_____

[6]Dr. Vonderheide states that she first met with Bica in January of 2003.  Bica's medical records, however, document that Dr. Vonderheide was Bica's therapist in December of 2000.

interpretation of the medical opinions and record evidence does
not provide sufficient consideration of the treating sources or
the consultative opinions about the effects of headaches,
depression, and anxiety on Bica's functional capacity.
Therefore, substantial evidence is lacking to support the ALJ's
determination that as of the date of the hearing, Bica was able
to do certain jobs identified by the vocational expert.

### 2. Residual Functional Capacity before June 30, 2003

Because the ALJ failed to assess properly whether Bica was
disabled at the time of the hearing, which was the purpose of the
remand, the ALJ's determination that Bica was not disabled before
her last insured date is missing a necessary element. See Bica,
2009 WL 3756894, at *4. In addition, the ALJ's review of the
record evidence pertinent to the earlier period is also
unpersuasive.

The ALJ discounts Dr. Vonderheide's opinions about Bica's
limitations before her last insured date because Dr. Vonderheide
does not have her treatment notes for sessions with Bica during
that time. Dr. Vonderheide testified at the hearing and provided
a summary of her recollection of treatment during the earlier

period.[7]  In addition, other medical evidence that is

contemporaneous with Dr. Vonderheide's early treatment of Bica

supports Dr. Vonderheide's opinions.

The record documents that Bica was treated for depression

and anxiety at least by 1997.  Donna Mohan, ARNP notes on July

22, 1999, that Bica was complaining of daily headaches, and Bica

was diagnosed with headaches and a probable migraine.  A year

later, Mohan noted that Bica complained of a headache lasting two

days.  In January of 2001, Dr. Fitzpatrick notes that Bica was

having migraine headaches and ordered a CT Scan.

Bica's first psychiatric evaluation was done in May of 2001

by Dr. Cusi.  Dr. Cusi first diagnosed bipolar disorder but later

noted a mood disorder.  Bica continued treatment with Dr. Cusi

for depression and fluctuating mood disorder.  In March and April

of 2003, Dr. Cusi noted that Bica was anxious, that she had poor

concentration, that she was tense, and that she had paranoid

---

[7]The ALJ characterizes Dr. Vonderheide's summary of her
treatment of Bica as a retrospective opinion.  Because Dr.
Vonderheide was treating Bica during the time in question, to the
extent her summary is based on her memory of treating Bica, it is
not a retrospective opinion.  Cf. Wilkins v. Sec'y, Dep't of
Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991)
(physician's opinion about claimant's depression during period
when physician was not treating claimant was retrospective);
Stocks v. Astrue, 2011 WL 3510959, at *2 (D. Md. Aug. 9, 2011);
Mitchell v. Astrue, 2010 WL 3749201, at *11 (N.D. Ga. Sept. 20,
2010).

perceptions.  In June of 2003, Dr. Cusi noted Bica had
fluctuating mood, racing thoughts, feelings of paranoia, poor
concentration, and other symptoms.  In July of 2003, she had a
neurological evaluation, and the doctor's impression was that she
was experiencing migraine headaches without aura.

The evidence the ALJ cites in support of his decision is
selectively culled from Bica's medical records.  With respect to
migraine headaches, the ALJ notes that in April of 2004 Bica
reported only two or three migraine headaches during the previous
six months.  However, context is important.  Dr. Lesser noted in
October of 2003 that Bica had chronic daily headaches, and he
increased her medication dosage.  Although Bica's headaches had
reduced in number by April of 2004, Dr. Lesser noted that Bica
was experiencing lightheadedness due to the medication and
lowered her dose.

The ALJ acknowledges Dr. Cusi's notes in June of 2003 but
denigrates the seriousness of Dr. Cusi's impressions, stating
that Dr. Cusi did not describe Bica's paranoid thoughts and
citing other notes by Dr. Cusi that Bica's thought processes were
relevant, that she remained active, and that she had good energy.
The ALJ further cited notes that despite depression and poor
sleep, Bica had a good appetite, improvement with medication,
coherent thoughts, cooperative attitude, and full orientation.

33

Despite the ALJ's focus on the positive, the medical records as a
whole show that Bica was experiencing anxiety and depression
which fluctuated in intensity and effect.

The ALJ criticizes Dr. Vonderheide's opinions of Bica's
mental capacity due to the lack of contemporaneous treatment
notes, inconsistent dates, and other minor inconsistencies
between Dr. Vonderheide's memory of Bica's treatment and the
testimony at the hearing.  Oddly, the ALJ also discredits Dr.
Vonderheide's opinions on the ground that her more recent
treatment notes showed therapy for marital and relationship
issues rather than for concentration, memory, or functional
limitations.  A brief review of the notes, however, shows that
Dr. Vonderheide indicated "Reported Symptoms" of depression,
anxiety, obsessive thoughts, sleep problems, and compulsive
behavior.  Although the "Topics Discussed Today" pertained at
times to Bica's interaction with her husband and her mother,
which could well be related to her mental health issues, the
topics also included discussions of her medications, her
symptoms, and other matters.

The ALJ emphasized Bica's work history, noting that she
worked full time until 1997, when she married and then gave birth
to her daughter.  The ALJ cites a treatment note in 2001 in which
Bica reported that her husband wanted her to work but she did not

34

want to and reviews Bica's history of part-time work through
2005.  The ALJ concluded that Bica's part-time work taken along
with her activities as a full-time parent are inconsistent with
being disabled from working.  In this case, however, it is not
clear that Bica's part-time work and her parenting experience,
taken together, equates to an ability to maintain full-time
work.[8]

Although the ALJ states that his residual functional
capacity assessment is supported by the medical evidence, that
does not appear to be the case.  Therefore, even if the ALJ had
properly evaluated Bica's residual functional capacity as of the
time of the hearing, the ALJ's analysis of the record for
purposes of determining Bica's capacity as of her last insured
date also lacks substantial evidence.

---

[8]Residual functional capacity "is an assessment of an
individual's ability to do sustained work-related physical and
mental activities in a work setting on a regular and continuing
basis.  A 'regular and continuing basis' means 8 hours a day, for
5 days a week, or an equivalent work schedule."  SSR 96-8p, 1996
WL 374184, at *1 (July 2, 1996).  Although part-time work that is
not substantial gainful activity may be considered to determine
whether a claimant was able to do more work than she actually
did, in this case, the ALJ did not analyze the part-time work
Bica was doing in the context of her limitations.  See 20 C.F.R.
§ 404.1571.

E.   <u>Remand</u>

Bica asks that the case be reversed and remanded but without
another hearing.  Bica argues that the record evidence
demonstrates that she has marked impairments in concentration,
persistence, and pace and relies on the vocational expert's
testimony that with those limitations, no jobs would exist that
she could do.  The Commissioner did not respond to that part of
Bica's motion.

Section 405(g) provides, in pertinent part: "The court shall
have power to enter, upon the pleadings and transcript of the
record, a judgment affirming, modifying, or reversing the
decision of the Commissioner of Social Security, with or without
remanding the cause for a rehearing."  The court can reverse a
decision of the Social Security Administration without remanding
for further proceedings, however, "only in the unusual case in
which the underlying facts and law are such that the agency has
no discretion to act in any manner other than to award or to deny
benefits."  <u>Seavey v. Barnhart</u>, 276 F.3d at 11.  That is not the
case here.

The ALJ's analysis of Bica's residual functional capacity
and disability was marred by a variety of errors.  However, the
facts in this case are not so clear that only one result is

possible.  Therefore, a reversal without remand is not an appropriate result.

### Conclusion

For the foregoing reasons, the claimant's motion to reverse (document no. 9) is granted.  The Commissioner's motion to affirm (document no.  11) is denied.

The case is remanded to the Social Security Administration under Sentence Four for further proceedings.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

November 17, 2011

cc:  Janine Gawryl, Esquire
     Robert J. Rabuck, Esquire